COLIN S. BRUCE, U.S. DISTRICT JUDGE
I. BACKGROUND
A. Procedural Background
Plaintiff's Complaint (# 1) was filed November 13, 2015, alleging three counts. Count I alleged unlawful First Amendment retaliation and prior restraint, Count II alleged a violation of Plaintiff's Fourteenth Amendment right to due process of law, and Count III alleged a state law pendent claim.
Defendants filed Motions to Dismiss on March 14, 2016, and February 9, 2017 (# 12, # 31). This court ruled on Defendants' Motions to Dismiss on July 22, 2016, and March 17, 2017 (# 25, # 35), dismissing Defendant Board of Trustees on grounds of sovereign immunity, dismissing as time-barred Plaintiff's claims insofar as they sought relief for adverse actions that occurred prior to November 13, 2013, and dismissing Count III for lack of jurisdiction.
This matter is now before the court on Defendants' Motion for Summary Judgment (# 64) and Defendants' Motion to Strike Plaintiff's Response to Motion for Summary Judgment (# 70). Both motions are fully briefed and ready for ruling.
B. Factual Background
The facts are taken from Defendants' Statement of Undisputed Material Facts,[1] Plaintiff's Additional Facts,[2] attachments to the Complaint, and supporting exhibits.
1. Pre-2009 Facts
Plaintiff began teaching at the University of Illinois at Urbana-Champaign (hereinafter, "the University") in the 1960s. Plaintiff includes many facts about things that happened between himself and the University before 2009, going all the way back to 1992. It is enough to say that Plaintiff has had a contentious relationship with the University. His disputes have included a dispute over who would head the Engineering Department and a dispute over University grading requirements. The grading requirements disagreement ultimately *1225 resulted in a federal suit by Plaintiff against the University. In affirming summary judgment for the University in that suit, the Seventh Circuit Court of Appeals noted that "[a]fter 28 years of teaching at the University of Illinois at Urbana-Champaign, Louis Wozniak became a rebel." Wozniak v. Conry , 236 F.3d 888, 889 (7th Cir. 2001). Plaintiff has continued conducting himself as such, ultimately giving rise to the facts underlying this suit.
2. The Teaching Award, Plaintiff's Investigation, and the University's Initial Response
The events relating to Plaintiff's termination began at an awards banquet in the spring of 2009 when an award that Plaintiff believed he should have received was given to another professor. The award was a teaching award given by two autonomous student honor societies. The award selection process was not a function of the University.
"Student A" led one of the honor societies, and another student led the other honor society. Lynell Lacy, the Coordinator of Development, Alumni and Student Relations, helped oversee the Awards Ceremony.
As to the award process, a Survey Monkey online poll was emailed to graduating seniors to select the winner. In a February 19, 2009, email from Student A to the other student honor society leader and Lacy, Student A communicated the results of the survey (which Plaintiff terms an "election") showing Plaintiff received 20.9% of votes, while Drs. Sreenivas and Abbas each received 18.6%. In that email, Student A then wrote "Plaintiff won two years ago, so I think we should go with one of the other two, but they got the same number of votes" before asking Lacy for suggestions to break the tie between Drs. Sreenivas and Abbas. The other student involved in the award selection process replied to Student A and Lacy, before Lacy replied, stating, "I vote we chose [sic] like Abbas for faculty because he encompasses both [Industrial Engineering] and [General Engineering] with his Decision Analysis focus." The next day, Lacy replied, informing the students that, "Professor Abbas recently won the NSF CAREER Award, a highly coveted and exceptionally competitive award for faculty in the early stages of their career, so if the decision were left to me, that would be my suggestion." Abbas received the award.
After Plaintiff did not receive the award, he took it upon himself to "investigate" the matter, asking Student A to stop by his office, which Student A did. Plaintiff questioned Student A about why he did not receive the teaching award. During the conversation, Student A began crying. Student A also told Plaintiff to speak with Lacy. Plaintiff spoke with Lacy about the teaching award. During the conversation, Lacy asked Plaintiff how he found out about receiving the most votes, to which Plaintiff replied "well, I don't disclose my sources." Lacy told Plaintiff that the department head, Jong-Shi Pang, "knew about this."
Thereafter, Plaintiff drafted a document he entitled "Pangi Scheme," detailing his claim of departmental interference in the teaching award selection process. The "Pangi Scheme" document disclosed Student A's role in the award selection process, and the fact that Student A "broke into tears and apologized several times." Plaintiff did not refer to her by name in the document, but he did provide information sufficient to identify her. Plaintiff circulated the "Pangi Scheme" document to faculty and staff, and added to his email signature a link to his website where he posted the "Pangi Scheme" document.
*1226 Later, Plaintiff contacted the two, now former, students who headed the teaching award selection process, asking that they speak with him. Neither student responded, so Plaintiff had his counsel write the students and request that they speak with him. After being contacted by one of the students, Associate University Counsel (and Defendant here) Laura Clower wrote to Plaintiff's counsel, attorney Michael Tague, informing him that neither student wished to speak with Plaintiff.
As Associate University Counsel, Clower represented the University, with all employees of the University potentially falling within the ambit of her representation. Part of Clower's duties included being available to provide advice and counsel to University personnel.
On February 4, 2010, Plaintiff filed a breach of contract lawsuit seeking money damages in the Circuit Court of Champaign County, Case No. 10-LM-151, against the two former students who headed the 2009 teaching award selection process. No written or oral contract existed between Plaintiff and the two former students. Plaintiff testified in his deposition that the purpose of this lawsuit was to interrogate the students regarding the teaching award selection process, with the plan to dismiss the lawsuit after getting the information. The lawsuit was dismissed for failing to state a claim on May 12, 2010.
On March 30, 2010, the Dean of the College of Engineering (and Defendant here), Ilesanmi Adesida, wrote to Plaintiff setting forth his expectation that all interactions with students be professional and appropriate, and specifically included instructions that Plaintiff refrain from further involvement of any students in his concerns about the teaching award.
As Dean, Adesida served as the chief executive officer of the College of Engineering, having the duty to protect the academic mission of the college, and to protect the academic welfare of the students.
Sometime in the spring of 2010 Plaintiff gave a video-recorded interview during which he discussed the circumstances surrounding the award, including his meeting with Student A. In the video, Plaintiff disclosed the fact that Student A cried during their conversation and, by also disclosing Student A's role in the student honor society, provided information sufficient to identify Student A. This video was eventually posted to YouTube, where it was publicly accessible, and Plaintiff began including a link to the video in his email signature.
On August 6, 2010, Dean Adesida wrote to Plaintiff informing him that his teaching and advising duties had been reassigned, and that his office would be moved. The Dean's letter stated that these decisions were based on Plaintiff's unacceptable behavior and interactions with students.
3. Termination Proceedings
On May 4, 2011, Dean Adesida wrote to the Office of the Provost, recommending that the University consider initiating an Article X action to dismiss Plaintiff for cause.
On May 9, 2011, the Interim Chancellor (and Defendant here), Robert Easter, in conjunction with the Vice Chancellor for Academic Affairs and Provost, Richard Wheeler, wrote to the President of the University (and Defendant here), Michael Hogan, and requested that he initiate an Article X proceeding to terminate Plaintiff's tenure and dismiss him for due cause.
The role of the Chancellor is to act as the chief executive officer of the Urbana-Champaign campus and to report to the President. The President serves as the chief executive officer of the entire University *1227 of Illinois System and, under Article X, Sec. 1(e)(1) of the University Statutes, has the authority to decide whether to institute dismissal proceedings against a tenured faculty member.
On May 12, 2011, President Hogan agreed that Plaintiff's conduct warranted consideration of tenure revocation, and delegated oversight of the Article X process to Interim Chancellor Easter.
On July 22, 2011, in accordance with the procedures set forth in Article X, Interim Chancellor Easter consulted with the Faculty Advisory Committee.
On August 11, 2011, Interim Chancellor Easter formally initiated termination procedures pursuant to Article X of the University Statutes, by filing a "Statement of Charges" with the Clerk of the Senate of the Urbana-Champaign Campus. The Statement of Charges set forth the charges and twenty allegations of misconduct in support of the charges. Later, the allegations were supplemented by the filing of an "Amendment to Allegations." As this court ruled in deciding Defendants' Motion to Dismiss, "any due process violations must have occurred after that date and must relate directly to Plaintiff's termination." Docket # 25, at 15.[3]
Plaintiff exercised his right to have the matter reviewed by the Committee on Academic Freedom and Tenure ("CAFT"). The CAFT, chaired by Defendant Matthew Finkin, held hearings over the course of four months in early 2012. During the hearings, Plaintiff was represented by counsel and was permitted to present evidence and witnesses on his behalf, and cross-examine the witnesses called by the University. The University was represented by Defendant Laura Clower. At the request of the Faculty Senate, Finkin continued acting as the Chairman of CAFT for the Wozniak matter until the CAFT issued its final report. After hearing all the evidence, the CAFT distributed its preliminary report to the parties, and invited the parties to submit written objections to the report. The parties submitted objections, which were considered by the CAFT before issuing its final report.
The CAFT issued its final report on January 9, 2013, making factual findings and recommendations. The CAFT Report stated that Plaintiff's conduct, while concerning and warranting discipline, did not warrant dismissal.
The CAFT Report criticized some of the University's allegations for a lack of specificity, and rejected the charges it found to be insufficiently specific. The CAFT found twelve charges to be sufficiently specific to warrant further analysis. Among the charges the CAFT considered were allegations Plaintiff had contacted the incoming 2010 student honor society presidents and requested a meeting with them, and a May 12, 2010, email to his students in which Plaintiff stated "I only remember the names of [students] I've had sex with."
The CAFT Report found that eleven of those charges did not support sanctioning Plaintiff. As to one charge, termed by the CAFT as "Charge 2," consisting of Plaintiff's dissemination of what occurred in the meeting with Student A, the CAFT Report found "...Plaintiff disclosed a student's emotional state to a broad audience with no legitimate need to know that information.
*1228 Furthermore, not only did he disclose that information, he continued to make that information widely available via a link in his email signature over an extended period of time."
In its recommendations, the CAFT stated, "though we do not believe that Plaintiff can be compelled to delete all reference to his complaint about the student award on his website, in email messages, or by other means, we recommend that he do so, in recognition of the mistrust he has engendered."
The CAFT also recommended that, "any reference that directly or indirectly discloses his conversation with [Student A] should be deleted and no future reference made to it by Plaintiff in any website, email, or the like means of public or quasi-public communication." Further, the CAFT recommended that, "Plaintiff should have no direct personal contact with any student with regard to his eligibility for or concerning the administration of the granting to any such award in the future." In its report, the CAFT stated that, "Plaintiff's failure or refusal to comply with either of the[se] two ... conditions shall be cause to dismiss him." The CAFT Report was silent with respect to Plaintiff's ability to disseminate general information regarding the allegedly rigged student election.
On February 8, 2013, President Easter, having become President on July 1, 2012, reviewed the CAFT Report's recommendations and decided to refer the matter to the Board of Trustees for final determination on whether to revoke Plaintiff's tenure. Plaintiff was sent notice that the decision had been referred to the Board of Trustees that same day.
The CAFT is an advisory body charged with making recommendations; it is not an ultimate decision maker. The Board of Trustees is the ultimate authority and the sole decision maker on the issue of tenure revocation.
Following the CAFT Report, Plaintiff posted information to his website including the un-redacted CAFT Report, un-redacted CAFT hearing exhibits, and an un-redacted copy of the transcripts of the CAFT hearings. The documents posted online by Plaintiff included student names and information, including information regarding Student A, and statements related to Student A crying, as well as information pertaining to numerous other students involved with the CAFT proceedings. On February 13, 2013, the Executive Vice Provost for Academic Affairs (and Defendant here), Barbara Wilson, wrote to Plaintiff, regarding his post-CAFT Report internet postings.
As Executive Vice Provost for Academic Affairs, Barbara Wilson's role was to support the Provost by assisting with, and advising on, academic matters, including student and faculty affairs.
Vice Provost Wilson informed Plaintiff that publication of personally identifiable student information was in violation of The Family Educational Rights and Privacy Act of 1974 ("FERPA") and University policy. Vice Provost Wilson directed Plaintiff to immediately remove all personally identifiable student information from his website and refrain from posting any such information in the future. Plaintiff acknowledged posting the information on his website, responding to Vice Provost Wilson's letter on February 15, 2013. He did not, however, immediately remove all personally identifiable student information from his website.
On February 25, 2013, Vice Provost Wilson wrote Plaintiff a second time, providing specific examples of personally identifiable student information that was still available on his publicly accessible website. Vice Provost Wilson stated that these were *1229 not an exhaustive list, but only a few examples, and that Plaintiff was responsible for ensuring that no personally identifiable student information remained on his website. Plaintiff agreed to remove the specifically identified information, but asked the University to identify any other examples of student information it wished redacted. Both of Vice Provost Wilson's letters are silent with respect to Plaintiff posting general information about his allegations pertaining to University faculty or staff involvement in the teaching award selection, instead instructing him only to cease posting personally identifiable student information.
On February 27, 2013, Vice Provost Wilson wrote a letter to Chancellor (and Defendant here), Phyllis Wise, regarding Plaintiff's internet postings, recommending that "this additional information be presented to President Easter for his assessment in light of the pending Article X charge." Chancellor Wise forwarded this letter to President Easter.
Also in February 2013 the University retained an outside attorney, Christopher Wilson, to help develop the process by which Plaintiff's case would be presented to the Board of Trustees. Attorney Christopher Wilson corresponded with the University and Plaintiff's attorney throughout the spring and summer of 2013 to develop the procedures to be used at the Board of Trustees hearing.
In March 2013, Chancellor Wise, at President Easter's direction, consulted with the Faculty Advisory Committee regarding Plaintiff's continued disclosure of protected student information, and how this conduct should be considered in light of the Article X dismissal proceeding pending against him. Chancellor Wise met with the Faculty Advisory Committee on March 28, 2013, and discussed whether additional charges against Plaintiff were required for the Board of Trustees to consider his recent conduct in the pending Article X proceeding. The Faculty Advisory Committee unanimously advised that the administration should consider any new evidence of violations of the CAFT Report's recommendations as part of the pending Article X proceeding, without needing to file additional charges under Article X. Chancellor Wise communicated these recommendations to President Easter on April 4, 2013.
April 18, 2013, is the first time the Board of Trustees hearing date of September 23, 2013, from 8:00 a.m. to noon, appears in the evidence. On the same day, attorney Christopher Wilson emailed other University employees that he would write Plaintiff about the hearing date and time. On May 7, 2013, Attorney Christopher Wilson emailed Plaintiff's counsel stating "the date time and location [of the hearing] are still being determined by the board." The parties have not pointed out to the court, and the court has not found it readily apparent, exactly when attorney Christopher Wilson first notified Plaintiff of the hearing date. However, Plaintiff's counsel had notice of the date and time at least as of May 17, 2013, when Plaintiff's counsel mentioned it in a letter he wrote to the CAFT.
In June 2013, Plaintiff was informed that the University would be presenting Plaintiff's post-CAFT Report publication of student information to the Board of Trustees.[4]
*1230 On July 19, 2013, attorney Christopher Wilson again informed Plaintiff's counsel that in addition to the evidence presented to the CAFT, and the CAFT Report, the University would be presenting evidence of Plaintiff's conduct after the CAFT Report. Specifically, Plaintiff was informed that the Board would hear evidence regarding Plaintiff posting personally identifiable student information on his website, in violation of FERPA, University policy, and the CAFT Report's recommendations.
Wilson also provided Plaintiff, through counsel, proposed procedures for pre-hearing matters and the hearing itself. Plaintiff disagreed with some of these procedures, and Plaintiff's counsel and the University engaged in extensive discussion of what the procedures should be. (Plaintiff's most succinct summary of his challenges to the process are found in his attorney's September 9, 2013, "Objections to Proposed Procedures for Tenure Hearing Matters." The issues he articulates there include the appropriate "standard of review" the Board of Trustees will apply to the CAFT Report, the amount of time allotted for a statement by the CAFT, who from the CAFT would make that statement to the Board of Trustees, and how to comply with Article X of the University Statutes regarding Plaintiff's post-CAFT Report conduct.
The President submitted his "Statement of Basis for Dismissal to Board of Trustees" on August 14, 2013. The CAFT took exception to the President's Statement because the Statement attacked the CAFT Report and the CAFT process. Defendant Johnson, then the CAFT Chair, expressed the CAFT's concerns to the President, resulting in the President submitting a revised "Statement of Basis for Dismissal to Board of Trustees" on August 29, 2013. Plaintiff's counsel received a copy of both Statements.
Plaintiff submitted his "Response to President's Replacement Statement in Support of Dismissal" approximately two weeks later. Plaintiff's 19-page response, submitted by his counsel, included arguments related to his post-CAFT Report conduct.
On September 17, 2013, the President submitted his "Trial Brief" setting forth his arguments. The list of exemplars, including evidence of post-CAFT Report conduct, was attached.
The next day, September 18, 2013, Plaintiff submitted his "Summary of Position," setting forth his written arguments. Plaintiff's Summary of Position included reference to his post-CAFT Report conduct.
The Board of Trustees, chaired by Defendant Chris Kennedy, conducted a four-hour hearing on September 23, 2013. At the hearing, both the President and Plaintiff were permitted to call witnesses, present evidence, and cross-examine witnesses. In addition to the evidence and briefs presented by the parties, the Board of Trustees had access to the complete record compiled by the CAFT. The CAFT record included the exhibits introduced during the CAFT hearings, and the transcripts of those hearings.
The University presented Vice Provost Wilson as a witness, and Plaintiff's counsel cross-examined Vice Provost Wilson. Plaintiff then testified on his own behalf. University counsel did not cross-examine Plaintiff. The Board of Trustees, consistent with Article X, Sec. 1(e)(7) of the University Statutes, invited a designee of the CAFT, Defendant Eric Johnson, then the current CAFT chair, to give a prepared statement regarding the CAFT Report and recommendations. Johnson became the Chairman of the CAFT in January 2013, after Finkin's term expired with the *1231 issuance of the CAFT Report. Neither party was permitted to examine Johnson at the Board of Trustees Hearing.
After the hearing, the Board of Trustees adjourned; no final decision was made on that date.
On November 14, 2013, the Board of Trustees issued its decision, revoking Plaintiff's tenure, and ordering that his employment with the University be terminated immediately.
In their Report, the Board of Trustees stated that Plaintiff engaged in misconduct which badly damaged the University's paramount obligation of maintaining the trust and confidences of its students. The Board of Trustees Report found Plaintiff's conduct incongruous with the fundamental mission of the University-protecting its relationship with its students-including ensuring that student confidences are maintained, and that information is not published about students without the consent required by University policies. The Board of Trustees Report stated that, due to his actions, Plaintiff could no longer be relied upon to perform his university duties and functions in a manner consonant with professional standards of competence and responsibility.
The President presented evidence to the Board of Trustees regarding allegations that the CAFT Report rejected, and the Board of Trustees discussed some of that evidence in their Report, but found that discussion of those allegations was moot because termination was warranted on other grounds. The Board of Trustees Report based Plaintiff's termination on Plaintiff having published confidential student information, finding the publication of said information was a violation of his professional ethics and a violation of the CAFT Report.
II. ANALYSIS
A. Defendants' Motion to Strike Plaintiff's Response
Defendants ask the court to strike Plaintiff's Response to Motion for Summary Judgment in its entirety for failure to comply with Central District of Illinois Local Rule 7.1(D)(2)(b)(1-4). Defendants are correct both that the court has discretion to grant their motion in an appropriate case and on the grounds they put forth, and that Plaintiff's Response fails to meet some requirements of the Local Rules. However, Plaintiff's Response presents the court with his arguments, and the court is confident in its ability to understand them. Because Plaintiff does not dispute the content or the materiality of Defendants' Undisputed Material Facts, and because the court disregards those "facts" for which Plaintiff provides insufficient citation, see n.1 and n.2 supra , many issues that could have arisen due to Plaintiff's non-conforming Response have been ameliorated. Thus, Defendants' Motion to Strike (# 70) is DENIED.
B. Summary Judgment Standard
Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) ; see also Celotex Corp. v. Catrett , 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp. , 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.
*1232 See Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; Singer v. Raemisch , 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See Singer , 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's characterization of the facts or a plaintiff's legal conclusion." Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258 , 688 F.Supp.2d 815, 835 (C.D. Ill. 2010) (emphasis in original).
Summary judgment is the "put up or shut up" moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. Johnson v. Cambridge Indus., Inc. , 325 F.3d 892, 901 (7th Cir. 2003). Therefore, in order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a metaphysical doubt as to the material facts. Michael v. St. Joseph Cty. , 259 F.3d 842, 845 (7th Cir. 2001). Instead, it must present definite, competent evidence to rebut the motion. Id. Where the plaintiff has the ultimate burden of proof at trial, the defendant may succeed on a motion for summary judgement simply by indicating the absence of evidence to support the plaintiff's claim. Celotex Corp. , 477 U.S. at 322, 106 S.Ct. 2548.
C. First Amendment Claim
Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that he suffered retaliation for exercising his First Amendment right to free speech. Plaintiff also alleges Defendants violated his First Amendment rights by placing a prior restraint on his engaging in protected speech.
Defendants argue Plaintiff was not speaking on a matter of public concern, Plaintiff's interests in expression do not outweigh the injury he could cause the University in meeting its educational mission, Plaintiff's speech was not a substantial or motivating factor in his termination, Plaintiff's speech was not subject to a prior restraint by the University, and finally that Defendants are entitled to qualified immunity as to both of Plaintiff's First Amendment claim theories. The court will address each argument in turn.
1. Retaliation
The Seventh Circuit Court of Appeals has summarized the relevant standard on retaliation claims in the First Amendment context:
It is well established that a public employee retains First Amendment rights to free speech. Pickering v. Bd. of Educ. , 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ; Vargas-Harrison v. Racine Unified Sch. Dist. , 272 F.3d 964, 970 (7th Cir. 2001). As a general rule, the government cannot retaliate against its employees for engaging in constitutionally protected speech. Vargas , 272 F.3d at 970. When a plaintiff brings a § 1983 claim for retaliation in violation of First Amendment rights in the employment context, our analysis involves three steps. First, the court must determine whether the employee's speech was constitutionally protected under the Connick - Pickering test. Phelan v. Cook County , 463 F.3d 773, 790 (7th Cir. 2006). Second, the plaintiff must establish that the speech was a substantial or motivating factor in the alleged retaliatory action. Id. Finally, if the plaintiff satisfies the first two steps, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech. Id.
Hutchins v. Clarke , 661 F.3d 947, 955 (7th Cir. 2011). See also, *1233 Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle , 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
This legal analysis is referred to hereinafter as the " Mt. Healthy analysis."[5]
The determination of whether speech is constitutionally protected is a question of law for the court. See Kokkinis v. Ivkovich , 185 F.3d 840, 843 (7th Cir. 1999).
The Connick - Pickering analysis, to determine whether speech is protected under the first step of the Mt. Healthy analysis, is itself a two-step inquiry. See Sullivan v. Ramirez , 360 F.3d 692, 697 (7th Cir. 2004).
The first step is to determine, pursuant to Connick and the decisions that flow from it, whether the speech addressed a matter of public concern. Id. at 698. The threshold inquiry, under Garcetti v. Ceballos , 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), is whether the public employee spoke as a private citizen, or instead spoke in his capacity as an employee. Chaklos v. Stevens , 560 F.3d 705, 711-12 (7th Cir. 2009). If he spoke as a private citizen, the court will look to the "content, form, and context" of the speech to determine whether the speech touches upon a matter of public concern. Id. at 712 (citing Connick v. Myers , 461 U.S. 138, 147-48, 148 n.7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ).
If the speech is found to be on a matter of public concern, then under the Pickering balancing test, "... the employee's speech is protected unless 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees' outweighs 'the interests of the [employee], as a citizen, in commenting upon matters of public concern." Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31 , --- U.S. ----, 138 S.Ct. 2448, 2471, 201 L.Ed.2d 924 (2018) (quoting Harris v. Quinn , 573 U.S. 616, 134 S.Ct. 2618, 2642, 189 L.Ed.2d 620 (2014) (quoting Pickering , 391 U.S. at 568, 88 S.Ct. 1731 ) ).
a. Public Concern
Defendants' first argument is that Plaintiff's speech was not on a matter of public concern.
The court first looks to the threshold inquiry of Plaintiff's status when making the speech at issue. Although the facts underlying this suit are certainly related to his status as an employee, there is no indication Plaintiff's speech was made pursuant to his responsibilities as a University professor. See Garcetti , 547 U.S. at 421, 126 S.Ct. 1951 (district attorney's expressions to supervisor, pursuant to official duties, about how to proceed with a case not speaking as a citizen for First Amendment purposes). Thus, from the evidence in the record, the court concludes that Plaintiff was speaking as a private citizen. Plaintiff has met this threshold inquiry.
The court must next consider the content, form, and context of Plaintiff's speech to determine whether he spoke on a matter of public concern.
While the content of the speech is the most important factor, Gustafson v. Jones , 290 F.3d 895, 907 (7th Cir. 2002), "the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [his] remarks on that subject protected,"
*1234 Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis , 42 F.3d 403, 410 (7th Cir. 1994). Rather, the motive of the speaker is a relevant, though not dispositive, factor because speech will not be protected if the only point of the speech was "to further some purely private interest." Kokkinis v. Ivkovich , 185 F.3d 840, 844 (7th Cir. 1999). Thus, although the fact that the speaker was partly motivated by personal concerns does not necessarily mean the speech cannot also be a matter of public concern, Greer v. Amesqua , 212 F.3d 358, 371 (7th Cir. 2000), "if the speech concerns a subject of public interest, but the expression addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." Marshall v. Porter County Plan Comm'n , 32 F.3d 1215, 1219 (7th Cir. 1994) (citing Smith v. Fruin , 28 F.3d 646 (7th Cir. 1994) ).
To resolve whether a personal grievance nonetheless raises to the level of public concern, "it is necessary to 'look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " Kokkinis , 185 F.3d at 844 (quoting Callaway v. Hafeman , 832 F.2d 414, 417 (7th Cir. 1987) ). We have held, for example, that a teacher's complaint about class size and discipline did not raise a matter of public concern when her complaint was in response to criticism of her performance, the complaint addressed only issues in her own classroom, and she only requested a reduction in her own class sizes. Cliff , 42 F.3d at 411. And we have held that a police detective's complaints about pervasive violations of an anti-smoking ordinance did not rise to the level of a public concern where it was "focused ... on the difficulties the speaker himself had experienced" and "made for purely personal reasons rather than a desire to air the merits of the issue." Smith , 28 F.3d at 652.
Bivens v. Trent , 591 F.3d 555, 560-61 (7th Cir. 2010).
"The question, then, is whether the context, form, and particular content (as opposed to the subject matter) of the speech indicate that [plaintiff] complained for the purely private purpose of resolving a workplace issue." Id. at 561.
After considering all of the context and circumstances of Plaintiff's speech, the court finds this factor weighs against Plaintiff. Though the subject matter of plaintiff's speech could potentially be of interest to the public, the actual content of his speech is more consistent with a purely personal grievance. Indeed, Plaintiff began engaging in the speech at issue because he believed that he should have won a "teacher of the year" award in 2009, but someone else was presented the award. This contention is a common thread running throughout Plaintiff's speech.[6]
As to the award process, a Survey Monkey online poll was taken among graduating seniors to select the winner. Plaintiff and two other professors received votes totaling within 2.3 percentage points of each other, with Plaintiff receiving the most (20.9 percent of votes) and the next two being tied (18.6 percent of votes each). The student leaders of the organizations presenting the award emailed each other and Lynell Lacy and discussed the survey results. One student said that since Plaintiff *1235 had won the award two years prior (2007) one of the other leading vote-getters should be selected, and asked Lacy for help with the tie-breaker. Before Lacy responded, the other student leader followed up and suggested one of the two professors tied for second. Lacy then agreed with that suggestion, and it was decided.
Instead of understanding the award for what it was ($ 500 and a plaque) and moving on, Plaintiff embarked upon a quixotic "investigation" into why he did not get the award. He interrogated a student to the point of tears in his University office. Some might even characterize Plaintiff's speech as paranoid, narcissistic, and petty. An excerpt from Plaintiff's "Pangi Scheme" document is but one example, though a solidly representative one, of the specific content of Plaintiff's speech, along with his intent and ultimate point:
I do not know the extent of the conspiracy to opaque my limelight; but, in my opinion, Ms. Lacy could not have singularly devised such scheme, as I consider her intellectual acuity at par with her perspective on acceptable ethical behavior. My conjecture is that there is a Conry-Goldberg connection, and especially the former, whose persona continues to pague [sic] the halls and influence department politics long after his retirement. But whether a Ms. Lacy driven conspiracy involved only herself and manipulated, inexperienced, and otherwise innocent students, or whether it included others and yourself, [department head Jong-Shi Pang] lasting damage has been perpetrated. Our honor students have been manipulated and shown by example that Illinois style ethics are, and by right ought to be, agenda dependent. The very meaning of excellence in teaching has been tarnished not only in IESE, but at our university, and perhaps profession by a department head and a low level administrator who, among other duties chairs a course that includes a section on ethics taught by our Prof. Goldberg.
Docket # 64-25, at 50.
After being suspended from teaching duties based on his behavior toward students during his "investigation," Plaintiff published an extensive amount of material online, including documents, videos, timelines, summaries, transcripts, and more. See, e.g., CAFT Report, Docket # 1-1, at 8; https://sites.google.com/site/illethics2/ (last visited Sept. 28, 2018) (including embedded YouTube video, 47:42 in length, entitled "Please Help Professor Wozniak"); Defendants' Motion for Summary Judgment Ex. 28 (another YouTube video).
Though the subject matter of some small portions of Plaintiff's speech concerned University administrators allegedly acting inappropriately, which might potentially touch upon a matter of public interest, the vast majority of Plaintiff's speech and complaints about the award were directly focused on the fact he that didn't receive it. Further, these complaints were without merit and were not legitimate. Defendants did not improperly intervene in a student election. The controversy Plaintiff chose to create is wholly baseless.
Further, although Plaintiff was unhappy that he was disciplined for the actions he chose to take, i.e., interrogating a student and publishing student information, the content of Plaintiff's speech is squarely focused on the impact on him , and his unfounded position that he was the rightful winner of the 2009 teaching award.[7] His *1236 speech was concerned with a personal grievance, specifically, he wanted the award and to this day insists he was improperly denied it.
Once he faced serious discipline, Plaintiff's speech diverged, both continuing to focus on how he was entitled to the award, and also focusing on how he was not receiving a fair disciplinary process. Plaintiff does not point the court to any speech related to issues aside from the problems Plaintiff raises concerning his disciplining. Plaintiff's "Help Professor Wozniak" video is emblematic of the specific content of his speech; he wanted help with his own personal crusade against the University. Therefore, the content factor weighs in favor of Defendants.
Further, the speech for which Plaintiff was actually terminated, publishing a student's emotional state to a broad audience and publishing a large amount of other student information, is independently not a matter of public concern. Names and personal information of University students do not add substantively to Plaintiff's speech. His choice to publish that information is therefore not protected.
Turning to the form of Plaintiff's speech, it was unquestionably public. Plaintiff filed internal grievances, but also sent blast emails to a wide cross-section of his contacts including students, alumni, and industry professionals. He spoke to various media outlets. He hosted two publicly accessible websites where he posted a large number of documents. He posted videos on YouTube. The form of his speech was certainly public, but that alone is insufficient to make his speech of public concern.
Plaintiff argues that local and regional news agencies have published front-page articles about Plaintiff's concerns, and in his deposition Plaintiff testified that there was "loads" of media attention. Plaintiff argues the news coverage of his case shows that his speech was important to the public. The court disagrees.
The record before the court contains only one news story: a printed-out, online Champaign News-Gazette article from February 20, 2013, reporting on the CAFT Report and its recommendations. The article in the record simply shows that a tenured faculty member at a major university, facing charges punishable by termination, is a subject matter of public interest. The article in the record does not focus on Plaintiff's contention that he was wrongly denied the award, or on his subsequent quest to expose perceived wrongs.
Plaintiff cites Gustafson , 290 F.3d at 908, in support of his news coverage argument. In Gustafson , two police officers were retaliated against after voicing concerns about an order issued by one of their supervisors, Jones. The effect of the order of which the officers complained was that all officers in a tactical unit could not follow up on investigations unless they received express permission from Jones. The policy failed to account for the fact that Jones may not have been on duty, or may have been otherwise unavailable to consider such a requests. Further, Jones' order was inconsistent with other department policies. The actual policy that the officers spoke about was substantively covered in the press as a public safety issue, rather than the fact that they faced discipline. The district court correctly found a legitimate public concern about the ability of law enforcement officers to carry out their duties. Gustafson , 290 F.3d at 909.
The facts here are not analogous. Here, Plaintiff was concerned with himself, the fact he did not get the award, and the fact *1237 that he felt he was not being treated fairly. The record does not provide support for a finding that Plaintiff was actually concerned with anything more.
Also in support of his position under the "form" element, Plaintiff argues "Defendants' displeasure with the public nature of Plaintiff's communications can be seen in their Article X charges that claimed that the airing of such 'dirty laundry' 'outside' of the University process was unprofessional and rendered the Plaintiff unfit to continue tenured employment with the University." Docket # 69, at 43. Plaintiff's argument mischaracterizes the record before the court. The Article X charges make no mention of "dirty laundry," and do not seek to punish Plaintiff for publishing complaints about the University outside the University process. Rather, the Article X charges focus on the fact that Plaintiff interrogated a student, published student information after being directed not to do so, and engaged in other behavior to the detriment of University students. The charges make no general reference to Plaintiff's public statements, nor do they seek to punish him for complaining and voicing his opinions generally.
Plaintiff's arguments about the form of his speech are not persuasive. Though public in nature, the form element weighs neither for or against a finding that Plaintiff's speech was on a matter of public concern.
Finally, the court turns to the context factor. The court begins by noting that Plaintiff had a contentious relationship with the University for a long time. His disputes in the past have included a fight over who would head the Engineering Department and a fight over University grading requirements.
The difficulties Plaintiff has had, at times, in functioning as a cohesive part of the University community inform the court about the motive behind Plaintiff's speech. "The motive of the speaker is a relevant, although not dispositive, factor because speech will not be protected if the only point of the speech were 'to further some purely private interest.' " Bivens , 591 F.3d at 561, quoting Kokkinis , 185 F.3d at 844.
Because Plaintiff spoke for the purpose of challenging a perceived wrong that was personal to him, and for all the reasons more thoroughly detailed in the "content" analysis above, the court finds the context of the speech weighs against finding Plaintiff spoke on a matter of public concern. Given Plaintiff's reference to "a Conry-Goldberg connection" in the "conspiracy to opaque my limelight" it appears Plaintiff was motivated by a personal vendetta, perhaps a vestige of his prior unsuccessful litigation against the University. He was ready to leverage literally anything into a full-blown conspiracy by the University against him and, to read his Complaint, the underpinnings of the democratic system itself.
Plaintiff argues the University termination process evolved into "proceedings to obstruct justice" in arguing the context of the case pushes his speech into the realm of public concern. The court finds no support in the record for Plaintiff's argument. Likewise, Plaintiff states he was "arguably terminated because senior level University officials were upset Plaintiff kept publically embarrassing them." Summary judgment, though, is not the time for Plaintiff to "arguably" show an issue exists for the jury. Plaintiff does not point the court to any support in the record for his contention that University officials were embarrassed or upset, and it is not the duty of the court to comb the record in an attempt to make his case for him. Therefore, the *1238 court rejects Plaintiff's context-based arguments.
Plaintiff cites this court's ruling in Sun v. Bd. of Tr. of Univ. of Ill. , 429 F.Supp.2d 1002, 1028 (C.D. Ill. 2006) in arguing Plaintiff's speech about the teacher of the year award was a matter of public concern, specifically "educational improvement and fiscal responsibility in public schools." In Sun , the plaintiff was a member of the committee who chose the recipient of a different Engineering Department teaching award; he chose one professor, and another professor was upset at not being chosen. The professor who was not chosen later attempted to build a coalition against the plaintiff's application for tenure. The plaintiff there did not get tenure, and subsequently filed suit alleging First Amendment retaliation based in part on the plaintiff's input into the decision of who was to receive the award. The award at issue in Sun carried an $ 8,000 prize, rather than the $ 500 prize here.
The court finds Sun 's ruling on the issue of public concern does not meaningfully guide the analysis here. In Sun , more money was at play when the court found that "fiscal responsibility" pushed the speech into the realm of public concern, while still opining the issue was a "close one." Sun , 429 F.Supp.2d at 1028.
The court also finds that Plaintiff's direct personal interest in receiving the award here, as detailed above, distinguishes the instant facts from those of Sun , where the plaintiff had no personal interest in who received the award. Indeed, the greater the amount of money at stake, the greater the likelihood the speech touches upon the "fiscal responsibility" matter of public concern. See Chaklos v. Stevens , 560 F.3d 705 (7th Cir. 2009) (finding public concern in case of speech challenging a $ 750,000 no-bid public contract, despite the plaintiffs having some personal interest in the challenged contract).
Moreover, all of Plaintiff's arguments lead, quite quickly, back to his own personal grievance. Considering the content, form, and context of Plaintiff's speech, the court concludes he did not speak on a matter of public concern. His speech was therefore not protected, his First Amendment claim fails as a matter of law, and summary judgment in favor of Defendants is appropriate on Count I as it pertains to retaliation.
b. Pickering Balancing
Defendants argue in the alternative that even if the court finds Plaintiff's speech involved a matter of public concern pursuant to the Connick test, under the Pickering balancing test his speech would still not be protected by the First Amendment. The court agrees.
Plaintiff's interest, as a private citizen, to speak on a matter of public concern "must not be outweighed by any injury the speech could cause to the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Cliff , 42 F.3d at 409 (quoting Pickering , 391 U.S. at 568, 88 S.Ct. 1731 ).
Here, Plaintiff's "investigation" regarding the teaching award interfered with the faculty's core responsibility to promote an environment that is conducive to learning. See Defendants' Statement of Undisputed Facts at ¶¶ 26-28 (filing a meritless lawsuit so he could interrogate the students about the award selection process) and ¶¶ 32-34 (producing, posting and distributing a video disclosing his interrogation of student, her emotional state, and including information sufficient to identify same student). Further, Plaintiff continued publically hosting a large amount of student information on the internet despite the University repeatedly telling him to take it down.
*1239 The undisputed facts clearly demonstrate that a careful and deliberate process was undertaken to determine whether Plaintiff's conduct ran afoul of the mission of the University, as discussed more fully in the section below regarding due process. According to both the CAFT Report and the Board of Trustees Report, "Prof. Wozniak acted in breach of professional ethics" when he publicized his interrogation of one of the students who decided the 2009 award recipient. Docket # 1-2, at 44-45 (Board of Trustees Report quoting the CAFT Report). Plaintiff's misconduct "badly damaged the University's paramount obligation of maintaining the trust and confidences of its students." Docket # 1-2, at 45. "The University's relationship with its students is its most precious fundamental mission." Id.
Plaintiff argues no actual or real disruption occurred and claims that the CAFT Report supports his position. Plaintiff's arguments are not persuasive.
Plaintiff argues Defendants have not met their burden in regard to showing disruption. The court was unable to locate the source of the quoted text Plaintiff included in his Response, which he attributed to simply "202," but the following case contains the language he quotes:
"[w]hen an employee speaks out about actual wrongdoing or breach of public trust on the part of her superiors, or speaks on serious matters of public concern, the government must make a more substantial showing than otherwise that the speech is, in fact, likely to be disruptive before the employee's actions may be punished. See Waters , 511 U.S. at 674, 114 S.Ct. at 1887 ; Connick , 461 U.S. at 148, 152, 103 S.Ct. at 1690, 1692.
Khuans v. Sch. Dist. 110 , 123 F.3d 1010, 1018 (7th Cir. 1997).
Plaintiff then attempts to amplify the showing Defendants must make, arguing Defendants have not shown "real disruption" or "actual disruption."
The court rejects Plaintiff's first argument for two reasons. First, as discussed above, Plaintiff was not speaking about actual wrongdoing or breach of public trust, nor was he speaking about a serious matter of public concern. Ruling in the alternative, even if some scintilla of public concern existed in Plaintiff's speech, in no way did the gravity of his speech increase the showing Defendants must make to justify his termination on the basis of likely disruption. In fact, if anything, the highly self-centered and vindictive nature of Plaintiff's speech serves to reduce any showing Defendants need to provide to support terminating his employment on the basis of likely disruption.
Second, the relevant standard, as acknowledged by the language Plaintiff himself quotes, is "likely disruptive," not the occurrence of actual or real disruption as Plaintiff argues. Defendants have provided sufficient evidence to show that their interest in promoting the efficiency of the public services the University performs outweighs Plaintiff's interests here because Plaintiff's behavior was likely to be disruptive to those services if the University did not terminate his employment.
Plaintiff next argues "[t]he CAFT looked closely and found 'no charge of defamation, invasion of privacy, intentional infliction of emotional distress or other wrongful conduct in the content of these messages.' " Docket # 69, at 47 (quoting the CAFT Report). But the messages the CAFT was referring to in the language Plaintiff quotes were Plaintiff's messages to the incoming officers of the independent student honor societies that grant the teaching award, asking them to meet with him. The CAFT was not making a blanket statement about all of Plaintiff's speech. In fact, the full quote from the CAFT Report *1240 distinguishes Plaintiff's interaction with the incoming student leaders from his behavior regarding Student A. The full CAFT Report quote is: "Importantly, there has been no charge of defamation, invasion of privacy, intentional infliction of emotional distress or other wrongful conduct in the content of these messages , as in the case of [Student A] just discussed." Docket # 1-1, at 56 (emphasis added).
The language in the section of the CAFT Report regarding Plaintiff's broadcasting his interrogation of Student A makes clear that the CAFT understood Plaintiff's behavior was wrong, was damaging to students, and was a breach of Plaintiff's professional ethics:
The Statement on Professional Ethics provides that faculty member[s] should "respect the confidential nature of the relationship between professor and student." A professor violates this precept by the wide distribution to those with no valid interest in the matter personal facts about a student that are embarrassing or sensitive. The fact that [Student A] cried in a private meeting with Prof. Wozniak is personally sensitive matter and he distributed that fact indiscriminately, essentially to the world at large. The Hearing Committee appreciates that to Prof. Wozniak, [Student A]'s emotional reaction constituted an admission of wrongdoing, an interpretation that [Student A] was fast to reject. But his belief in the righteousness of his cause is no defense. He is not licensed to breach the confidentiality of the student relationship, promiscuously to invade a student's privacy, because he believed it aided his personal cause. The Hearing Committee finds that in doing so Prof. Wozniak acted in breach of professional ethics.
Docket # 1-1, at 51.
Plaintiff's argument here, despite the latitude he takes with the evidence, still tends to make Defendants' case for them: Plaintiff went so far as to invite the incoming student honor society presidents to meet with him, after having sued their predecessors over the way they carried out their (independent student honor society) duties. Those incoming students then could either turn down an invitation for a meeting from a professor, or accept the meeting and worry that something they said would end up with them having to defend themselves in a courtroom. Within this context, a student would understandably feel "disruption" to their educational environment after being placed in that position by Plaintiff, a professor at their University.
Ruling in the alternative, the court finds the Pickering balancing analysis, the second part of the Connick - Pickering test to determine if Plaintiff's speech was protected under the First Amendment, weighs against Plaintiff. Plaintiff's behavior was destructive to the relationship between the University and its students. The public service the state is performing in this case is providing education to students. The University's interest in making sure professors do not interrogate students, publicize sensitive and personally identifying information about them, and create an environment like Plaintiff created by his actions, outweighs any interest of Plaintiff in making his speech. For this reason as well, Defendants are entitled to summary judgment as to Count I insofar as that count pertains to retaliation.
c. Substantial or Motivating Factor: University Would Have Taken Same Action Regardless of Plaintiff's Speech
Defendants next argue, in the alternative, that even if Plaintiff's speech *1241 were protected based on the Connick - Pickering test, under the second and third steps of the Mt. Healthy analysis, Plaintiff has not shown his speech was a motivating factor in his termination, and the University would have terminated him regardless of any protected speech he may have made.
"To establish a causal link between the protected expression and a subsequent action by the employer, the plaintiff must show that the protected conduct was a substantial or motivating factor in the employer's decision." Massey v. Johnson , 457 F.3d 711, 717 (7th Cir. 2006) (citing Mt. Healthy , 429 U.S. at 287, 97 S.Ct. 568 ). "A motivating factor does not amount to a but-for factor or to the only factor, but rather a factor that motivated the defendant's actions." Massey , 457 F.3d at 717.
If a plaintiff makes this threshold showing, the burden then shifts to the defendants to produce evidence that they would have fired the plaintiff even in absence of the speech. Id.
First, the court addresses Defendants' argument that Plaintiff cannot show he was terminated in retaliation for protected speech. The University began termination proceedings on August 11, 2011, well before Plaintiff published confidential student information in violation of the CAFT Report recommendations. The bases for initiating termination proceedings included Plaintiff's speech and actions going back to 2009 when he first learned he did not receive the teaching award. The court has already engaged in a detailed analysis and found Plaintiff's speech was not protected. But, in ruling on Defendants' alternative argument, the court presumes, arguendo , that some element of Plaintiff's speech was protected. Because termination proceedings were initiated based on Plaintiff's speech and actions before the CAFT Report, the court finds, only for the purpose of ruling on Defendants' alternative argument, that Plaintiff's speech was a motivating factor in his termination.
Having found Plaintiff's speech was a motivating factor in his termination, next the court considers Defendants' alternative argument that the record contains ample evidence that the Board of Trustees would have taken the same action against Plaintiff even absent any protected speech.
Plaintiff does not directly respond to this argument, instead merely listing some examples of evidence the University relied upon in the termination proceedings. See Docket # 69, at 45. Plaintiff does not argue that his choice to publish confidential student information, after the CAFT Report, was protected speech. Rather, he argues that his other speech, related to communicating about the teaching award "scheme" (both pre-and post-CAFT Report) was protected and that that speech was the basis for termination.[8]
In discussing Plaintiff's pre-CAFT Report conduct, the Board of Trustees stated:
Prof. Wozniak disseminated confidential information concerning his interactions with students including a student's emotional state. That Prof. Wozniak could have abused this relationship without regret or apology is unacceptable for any *1242 member of the University, let alone an experienced member of our faculty. The Board also finds it notable that in his testimony before us, Prof. Wozniak offered neither an apology nor an explanation for his repeated dissemination of this confidential student information. Instead, he contended repeatedly that his treatment of the students was a necessary reaction to the denial of an award. We find that Prof. Wozniak's testimony indicates a fundamental lack of understanding for the responsibility that faculty members must have for the privacy concerns of their students.
...
In addition to his misconduct concerning this specific student interaction [with Student A], however, we also find clear and convincing evidence that Prof. Wozniak engaged in other acts of misconduct which harmed students and created a hostile educational environment as part of his efforts to improve his status or correct self-perceived wrongs caused by others. These include filing a lawsuit against the individual students seeking monetary damages and engaging in questionable and potentially harassing activities involving the incoming honor society presidents for 2010. There is also clear and convincing evidence that the students involved in these latter incidents felt that Prof. Wozniak had attempted to interfere improperly with their grades as retaliation for their participation in the student honor award process.
Docket # 1-2, at 44-46.
However, the Board of Trustees did not actually fire Plaintiff for any of these actions, even though they were improper. The Board of Trustees Report found discussion of all these examples of Plaintiff's bad behavior were moot, given Plaintiff's post-CAFT Report conduct. Id. at 46. Instead, the Board of Trustees terminated Plaintiff's employment because he published confidential student information in violation of the CAFT directive.
The Board went on to state, in analyzing Plaintiff's post-CAFT Report conduct:
Reviewing Prof. Wozniak's actions following the CAFT Report, we must consider whether there is "clear and convincing" evidence that Prof. Wozniak violated the terms of the CAFT directive. There can be no question that the evidence presented meets this standard. Following the CAFT Report on January 9, 2013, Prof. Wozniak repeatedly published additional confidential student information regarding the 2009 teaching award and Prof. Wozniak's investigation. Executive Vice Provost Wilson wrote to Prof. Wozniak about these violations twice in February 2013. At the September 23 hearing, Executive Vice Provost Wilson testified to multiple examples of such publication, including video and internet postings. In his presentation at the hearing, Prof. Wozniak did not deny that he had published these materials, nor did he offer any basis on which to conclude that his conduct could be considered anything other than a flagrant and intentional disregard of the CAFT directive.
In fact, Prof. Wozniak defiantly stated on his YouTube video, published after the CAFT report, that he would "not be muzzled." It appears that Prof. Wozniak is unwilling or unable to abide by rules or expectations with which he disagrees. This indicates that the pattern of escalation of disputes and conflicts with students would inevitably continue in the future. We find that there is "clear and convincing" evidence that Prof. Wozniak *1243 violated the CAFT directive and published confidential student information.
Docket # 1-2, at 46-47 (emphasis added).
Plaintiff's decision to post the names of multiple students and Student A's emotional state, after being expressly told not to in the CAFT Report, is the reason he was terminated. Plaintiff's publishing confidential student information was not protected speech, and Plaintiff never argues that it is protected speech. Therefore, ruling in the alternative, even if some element of Plaintiff's initial speech concerning the award was protected and motivated Defendants to terminate him, Defendants have shown they would have terminated Plaintiff in the absence of any such speech, solely on the basis of his publishing confidential student information after the CAFT Report. Defendants are entitled to summary judgment on Count I, as it relates to retaliation, on this basis as well.
2. Prior Restraint
Plaintiff argues that he has "adequately pled 'prior restraint,' " and, therefore, Defendants' motion should be denied. Docket # 69, at 49. The court agrees that Plaintiff adequately pled prior restraint. But Defendants' motion is not a motion to dismiss. Rather, it is a motion for summary judgment. At the pleading stage general allegations may suffice. "[I]n response to a motion for summary judgment, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'...." Lujan v. Defenders of Wildlife , 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiff has failed to do so here.
The term "prior restraint" is used to describe "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." Alexander v. United States , 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (quoting Melville Nimmer, Nimmer on Freedom of Speech , § 4.03, p. 4-14 (1984) ).
A restriction is a prior restraint if it meets four elements: (1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the decision maker.
Samuelson v. LaPorte Cmty. Sch. Corp. , 526 F.3d 1046, 1051 (7th Cir. 2008) (quoting Southeastern Promotions, Ltd. v. Conrad , 420 U.S. 546, 554, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) ).
"... [W]e first must determine whether that policy applies to speech that is protected by the First Amendment. For the restriction to qualify as a prior restraint, the employee must have an interest in the speech as a citizen commenting upon a matter of public concern." Samuelson , 526 F.3d at 1052 (citations omitted). If the restrained speech would be on a matter of public concern, the court then engages in a Pickering -like balancing test in which "[t]he government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the government." See United States v. Nat'l Treasury Employees Union , 513 U.S. 454, 467-69, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (hereinafter, " NTEU ") (citation omitted).
*1244 Prior restraints on employee speech by government employers are often poorly-tailored and over-broad blanket policies. See, e.g., NTEU , 513 U.S. at 467-69, 115 S.Ct. 1003 (statutory prohibition on nearly all federal employees accepting payment for an appearance, speech, or article on a multitude of issues violates First Amendment as improper prior restraint); Crue v. Aiken , 370 F.3d 668, 679-80 (7th Cir. 2004) (prohibiting all members of the University of Illinois community from contacting prospective student-athletes to inform them in any way about the Chief Illiniwek controversy was improper prior restraint); Milwaukee Police Ass'n v. Jones , 192 F.3d 742, 750 (7th Cir. 1999) ( NTEU test appropriate where police department policy prohibited all department employees from discussing allegations of misconduct by other department employees with anyone, including union representatives or lawyers). A broad restraint increases the government's burden in justifying it against the speech interests of employees, as opposed to a single supervisory decision. See NTEU , 513 U.S. at 466-68, 115 S.Ct. 1003.
Plaintiff's prior restraint argument here focuses on the following language from the CAFT Report:
Second and categorically, any reference that directly or indirectly discloses his conversation with [Student A] should be deleted and no future reference be made to it by Prof. Wozniak in any website, email, or the like means of public or quasi-public communication.
...
Prof. Wozniak's failure or refusal to comply with either of the two latter conditions shall be cause to dismiss him.
Docket # 69, at 48 (quoting CAFT Report p. 63 (Docket # 1-1, at 69-70) ).
Defendants argue that the CAFT Report was merely a recommendation, rather than a directive, and therefore not a prior restraint. The undisputed facts, if viewed in a vacuum, would support Defendants' argument. See Defendants' Statement of Undisputed Facts at ¶¶ 53, 54, 55 (describing CAFT Report as a "recommendation"). However, viewing the entire record, the court disagrees with Defendants' assertion that the CAFT Report was merely a recommendation. The Board of Trustees Report repeatedly refers to the CAFT Report as a "directive." And although there appears to be substantial support in the Board of Trustees Report for Plaintiff being terminated on other grounds, the reason he was terminated was for continuing to publish student information even after he received clear notice not to do so by way of the CAFT Report.
The court simply agrees with Defendant that the CAFT Report was a "recommendation" to the extent it was not binding on the University. The court further agrees with Defendants that the CAFT was itself not a "decision maker" in regard to Plaintiff's termination. Decision making was the job of the Board of Trustees, who are no longer a party to this suit. So, even if Plaintiff's speech were protected, which it is not as discussed below, the CAFT was not a "decision maker" capable of actually restraining Plaintiff's speech.
Plaintiff, on the other hand, formulates the CAFT Report as an "administrative decision," which is also not completely accurate. Given that the CAFT Report recommended Plaintiff be terminated if he failed to follow its recommendations regarding publishing student information, the Report is more analogous to an administrative notice, on the specific facts of this case. Any reasonable person in Plaintiff's position would have understood, after receiving the CAFT Report, that if he continued *1245 to publish student information he could possibly be subject to termination, albeit at the hand of the Board of Trustees rather than the CAFT.
Given the sequential nature of the CAFT-Board of Trustees termination process, the court may also rule on the substance of Plaintiff's prior restraint argument in regard to the issues of public concern and the NTEU - Pickering balancing test.
The court has already ruled that Plaintiff's speech was not upon a matter of public concern, as detailed above in regard to retaliation. Such analysis applies with equal effect to the prohibited speech here. The court finds Plaintiff was not prohibited from engaging in speech on a matter of public concern, but rather speech on a matter of concern only to himself. Further, the prohibited speech Plaintiff objects to in his Response is limited to a prohibition on publication of the facts of Plaintiff's highly inappropriate interrogation of a University student, which the court also finds not of public concern in and of itself. Because the restrained speech was not upon a matter of public concern, the CAFT Report cannot be found to be a prior restraint. See NTEU , 513 U.S. at 465-66, 115 S.Ct. 1003.
Even if Plaintiff's speech did touch upon a matter of public concern, then under the modified Pickering -style balancing test described in NTEU , the speech Plaintiff was prohibited from engaging in was not protected. The facts of this case bear no resemblance to the facts in NTEU , Crue , or Milwaukee Police Ass'n. Those cases all dealt with broad prohibitions on non-specific types of speech by a wide category of government employees. The prohibition here, on the other hand, deals with exactly one employee, prohibits a narrow category of speech related to students, and was recommended by the CAFT in direct response to Plaintiff's inappropriate behavior. The balancing test here, given the narrowly tailored nature of the CAFT Report's recommendation, is essentially the same as the Pickering test with the additional consideration of the interests of "potential audiences."
No consideration is due to the interests of "a vast group of present and future employees," because the restriction applied solely to Plaintiff. No consideration is due to a "broad range of present and future expression," again, because the restriction here was narrowly tailored to prevent specific speech on a specific topic. The balancing test weighs against Plaintiff for several reasons.
There is no dispute that the CAFT Report was silent with respect to Plaintiff's ability to disseminate general information regarding the allegedly rigged student election. See Defendants' Statement of Undisputed Facts at ¶ 57. Nonetheless, Plaintiff argues the CAFT Report instructed him not to share information "that would bear upon a reader's determination as to the credibility of the assertions or he would be fired." After a careful reading of Plaintiff's Response, the record, and Defendants' Motion and Reply, the court finds Plaintiff's interest in continuing to publish information about his interrogation of a student to support the "credibility" of his allegations, as well as the interests of any potential audience for that speech, is clearly outweighed by the University's interests in providing educational services without interruption.
If Plaintiff were to continue publishing the account of what he had done to this student, and were to continue publishing information containing identifiable student information, actual damage to the trust between the University and its students would occur. As discussed above in analyzing the Pickering balancing test in regard to retaliation, Plaintiff's actions were destructive *1246 to the learning environment. Any potential audience for the prohibited speech could find easy access to a trove of information published by Plaintiff that presents his position quite clearly, even absent the prohibited information. The balance favors the Defendants. Therefore, Plaintiff's speech was not protected. Summary judgment is granted for Defendants on Plaintiff's Count I insofar as it constitutes a claim for prior restraint.
3. Qualified Immunity
Defendants also argue that they are entitled to qualified immunity on Plaintiff's First Amendment claims. As an initial matter, and as set forth above, because the court has already found that Plaintiff failed to set forth a constitutional claim, Defendants, in their individual capacities, are entitled to qualified immunity on Count I. See Pearson v. Callahan , 555 U.S. 223, 236-37, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Further, even if Plaintiff had set forth a constitutional claim, Defendants would still be entitled to qualified immunity.
The Seventh Circuit recently explained:
Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about. Mustafa v. City of Chicago , 442 F.3d 544, 548 (7th Cir. 2006) (emphasis in original) (citation omitted). It protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs , 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Once qualified immunity is raised, the plaintiff has the burden of establishing that his or her rights were violated and that the law concerning the proffered right "was clearly established at the time the challenged conduct occurred." Mustafa , 442 F.3d at 548. Then, the court must determine whether a reasonably competent official would know that the conduct was unlawful in the situation he confronted.
Burritt v. Ditlefsen , 807 F.3d 239, 249 (7th Cir. 2015).
The court has found that Defendants could terminate Plaintiff and could restrain him from publishing information about Student A and any other student identifying information. Now, ruling in the alternative, the court finds Defendants are entitled to qualified immunity. Although the general rules were clearly established, it was not sufficiently clear to the Defendants' that their conduct was unlawful, based upon the evidence in the record.
The general rule prohibiting retaliation against an employee who exercises his First Amendment rights was clear at all times relevant. Chaklos , 560 F.3d at 716 (citing Miller v. Jones , 444 F.3d 929, 939 (7th Cir. 2006) ; McGreal v. Ostrov , 368 F.3d 657, 683 (7th Cir. 2004) ); Hutchins , 661 F.3d at 955. Likewise, the general rule against prior restraint of employee speech was also clear. NTEU , 513 U.S. at 475-76, 115 S.Ct. 1003 ; Crue , 370 F.3d at 679-80 ; Milwaukee Police Ass'n , 192 F.3d at 750.
However, as the extent of the analysis of both issues in this order demonstrates, Plaintiff's right to First Amendment protections on these facts was far from obvious. If Plaintiff's only purpose was to lodge a complaint it may have been sufficiently clear to Defendants that his speech was protected. If Plaintiff had not engaged in repeated disregard for the confidentiality of student information to further his own interests, it may have been more clear that his speech was protected. However, on these facts, where Plaintiff's speech revolved around issues of interest only to him, in disregard for his ethical responsibilities, in violation of the confidentiality of *1247 students' information, and to the detriment of students' educational environment, ruling in the alternative, the court finds Defendants are entitled to qualified immunity on Count I because the proffered rights were not clearly established as they apply to the facts of Plaintiff's claims. See Chaklos , 560 F.3d 705, 716.
D. Due Process
Plaintiff claims, in his Count II, pursuant to 42 U.S.C. § 1983, that Defendants violated his right to due process as guaranteed by the Fourteenth Amendment in terminating his employment with the University. The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. A tenured faculty member has a protected property interest in his employment. See Gilbert v. Homar , 520 U.S. 924, 928-29, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997).
As an initial matter, the court reiterates that merely pleading a cause of action is insufficient at this stage of the litigation. Plaintiff argues that he has "adequately pled that Defendants violated his Fourteenth Amendment rights" and, therefore, Defendants' motion (which Plaintiff here refers to as a "motion to dismiss") should be denied. Docket # 69, at 62. The court agrees that Plaintiff adequately pled a due process violation. But Defendants' motion is not a motion to dismiss. Rather, it is a motion for summary judgment.
Once again, at the pleadings stage general allegations may suffice. "[I]n response to a motion for summary judgment, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'...." Lujan v. Defenders of Wildlife , 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The nonmovant will successfully oppose summary judgment only when he presents "definite, competent evidence to rebut the motion." E.E.O.C. v. Sears, Roebuck & Co. , 233 F.3d 432, 437 (7th Cir. 2000) (quotation omitted). Plaintiff has failed to do so in support of his due process claim here, and thus summary judgment in favor of Defendants' is appropriate here.
"The hallmarks of procedural due process are notice and an opportunity to be heard." Pugel v. Bd. of Trs. of the Univ. of Ill. , 378 F.3d 659, 662 (7th Cir. 2004) (citing Mullane v. Central Hanover Bank & Tr. Co. , 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ). "Due process is a flexible concept that 'calls for such procedural protections as the particular situation demands.' " Pugel , 378 F.3d at 663 (quoting Gilbert , 520 U.S. at 930, 117 S.Ct. 1807 ). To evaluate the adequacy of procedural protections in a particular situation, the court will consider, " '[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.' " Id. (quoting Gilbert , 520 U.S. at 931-32, 117 S.Ct. 1807 ). The Supreme Court has held that a pre-termination hearing is necessary in the case of a tenured public employee. Cleveland Bd. of Educ. v. Loudermill , 470 U.S. 532, 542-46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).
"Due process does not guarantee 'right' substantive outcomes or correct conclusions of law." Woods v. City of Michigan City, Ind. , 940 F.2d 275, 285 (7th Cir. 1991). "It guarantees advance notice of charges and a fair chance to refute them." Id. The Due Process Clause is not a guarantee against incorrect results, or ill-advised personnel decisions.
*1248 Bishop v. Wood , 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (overruled on other grounds by Loudermill , 470 U.S. at 542-46, 105 S.Ct. 1487 ); Collins v. City of Harker Heights, Tex. , 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).
The parties are in agreement that due process does not require all University policies to be followed. Thus, the standards applied are those articulated above.
Defendants argue that Plaintiff was provided with detailed notice of the charges and allegations reflecting the University's evidence against him and was provided an adequate opportunity to be heard. Defendants also argue they are entitled to qualified immunity on Plaintiff's due process claims.
Plaintiff contends he was provided only "sham process." To support his contention, he argues the Engineering Department discipline hearing did not adhere to University guidelines, the Board of Trustees re-considered charges the CAFT Report found did not warrant sanction, the Board of Trustees considered Plaintiff's post-CAFT Report misconduct directly (instead of holding another CAFT hearing on that misconduct), the notice he received was insufficient, the hearing he received was insufficient, and the fairness of the entire process was undermined by attorney Christopher Wilson's involvement.
The court addresses each of these arguments in turn.
1. Notice
"Notice is constitutionally adequate if it is reasonably calculated to apprise interested parties of the proceeding and afford them an opportunity to present their objections." Head v. Chicago Sch. Reform Bd. of Trs. , 225 F.3d 794, 804, (7th Cir. 2000) (citing Memphis Light, Gas & Water Div. v. Craft , 436 U.S. 1, 14, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) ); Mullane , 339 U.S. at 314, 70 S.Ct. 652 ; Hartland Sportsman's Club, Inc. v. Town of Delafield , 35 F.3d 1198, 1201 (7th Cir. 1994). See also Loudermill , 470 U.S. at 546, 105 S.Ct. 1487 (tenured public employee entitled to oral or written notice of charges against him, explanation of the employer's evidence).
The Statement of Charges for Dismissal for Due Cause and Termination of Tenure ("Statement of Charges"), signed by Defendant Interim Chancellor Easter on August 11, 2011, started the termination process. The Statement of Charges was received by Plaintiff and was the basis for two separate hearings at which Plaintiff was represented by counsel and at which he contested the charges and allegations against him. The Statement of Charges states the nature of the proceedings ("initiating dismissal proceedings against Professor Louis Wozniak") and clearly identifies the charges and allegations. Docket # 1-1, at 1-6. An Amendment to Allegations, concerning Plaintiff's August 23 and August 24, 2010, actions of talking to classes, despite being suspended from teaching, and his subsequent emails to students to inform them he was not actually teaching their classes, was provided to Plaintiff on April 5, 2012.
Upon receiving the Statement of Charges, Plaintiff exercised his right to a hearing before the CAFT, which held extensive hearings based on the Statement of Charges and Amendment to Allegations during January, February, March, and April 2012, and issued its Report on January 9, 2013, as discussed more fully in the "hearing" analysis below.
After the CAFT Report was issued, Plaintiff posted additional material online, including the un-redacted CAFT Report and hearing transcripts, which included student names and information. After these additional disclosures of student information, *1249 and months in advance of the Board of Trustees hearing, Plaintiff was repeatedly given notice that the Board of Trustees would consider these additional allegations of misconduct.
On February 13, 2013, the Executive Vice Provost for Academic Affairs, Defendant Barbara Wilson, wrote to Plaintiff regarding his post-CAFT Report internet postings, informing him those postings were in violation of FERPA and University policy, and directing him to remove all personally identifiable student information from his website. On February 25, 2013, Defendant Barbara Wilson again wrote to Plaintiff providing specific examples of personally identifiable student information that was still publicly available on his website.
A June 26, 2013, letter from Plaintiff's counsel to the University discussed Plaintiff's post-CAFT Report conduct, and challenged its admissibility at the Board of Trustees hearing. The June 26 letter identified that Plaintiff had received materials from Defendant University Counsel Clower, to be presented at the Board of Trustees hearing, including material from his post-CAFT Report disclosures of student information. Therefore, Plaintiff had at least 89 days' notice before the September 23, 2013, hearing that his post-CAFT Report disclosures would be presented at the Board of Trustees hearing. On July 19, 2013, 66 days before Plaintiff's hearing, Attorney Christopher Wilson again confirmed in writing to Plaintiff's counsel that in addition to the evidence presented to the CAFT, and the CAFT Report, the University would be presenting evidence of Plaintiff posting personally identifiable student information on his website, in violation of FERPA, University policy, and the CAFT Report.[9]
Regarding notice of the date and time of the September 23, 2013, Board of Trustees hearing, Plaintiff had notice of the hearing date at least as of May 17, 2013, some 129 days before the hearing, when Plaintiff's counsel mentioned it in a letter he wrote to the CAFT.
Plaintiff argues even if he did receive reasonable notice of the issues, he was still deprived of due process because he can demonstrate that he was misled by attorney Christopher Wilson about the information that was to be considered at the Board hearing, about the nature of the Board hearing itself, and even about the date and time of the Board hearing. Christopher Wilson is an attorney hired by the University to advise them about Plaintiff's termination proceedings.
The court rejects Plaintiff's argument. The University is entitled to legal representation, and the fact that the University engaged outside counsel to advise them on the termination process does not invalidate the Board of Trustees hearing process. Plaintiff was entitled to notice and a fair hearing, but he was not entitled to, as he seems to argue, involvement in every decision about the hearing procedures made by the University.
As to the argument that attorney Christopher Wilson misled Plaintiff about the date and time of the hearing: attorney Christopher Wilson wrote Plaintiff's counsel on May 7, 2013, and said the "date, time, and location" of the Board of Trustees hearing were not yet final. It is unclear from the record if all those elements were actually final on May 7, 2013, or not-the date and time apparently were final as of April 18, 2013-but any delay before May 17, 2013, given that the hearing took place on September 23, 2013, 129 *1250 days later, was minimal and inconsequential. This is especially true where Plaintiff was represented by counsel and knew that after the CAFT hearing, the Board of Trustees would make the ultimate decision about whether he would be terminated after another hearing. Thus, whether Plaintiff knew the exact date and time of that hearing 129 days before the hearing or 160 days before the hearing does not bear on whether he received constitutionally sufficient notice.
The multiple forms of written notice Plaintiff received, as detailed above, were constitutionally adequate. The notices Plaintiff received were reasonably calculated to apprise Plaintiff of both the CAFT and Board of Trustees proceedings and afforded him an opportunity to present his objections. Head , 225 F.3d at 804. Based on the uncontested record, the court finds that the University went out of its way to provide Plaintiff a detailed explanation of the evidence to be used against him as required by Loudermill.
2. Opportunity to be Heard
In addition to notice, Plaintiff was entitled to an impartial hearing. The Supreme Court has described this as "an opportunity to present his side of the story." Loudermill , 470 U.S. at 546, 105 S.Ct. 1487. "Due process requires that a hearing 'must be a real one, not a sham or a pretense.' " Ciechon v. City of Chicago , 686 F.2d 511, 517 (7th Cir. 1982) (quoting Joint Anti-Fascist Refugee Comm. v. McGrath , 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ). "The mere 'deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. ' " Zinermon v. Burch , 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (citation omitted) (emphasis in original).
Initially, the court addresses Plaintiff's argument that the Engineering Department disciplinary proceedings that took place before the President initiated termination proceedings violated Plaintiff's due process rights. The court rejects these arguments on two separate bases.
First, any violation of Plaintiff's rights that occurred prior to November 13, 2013, is barred by the two-year statute of limitations. As this court ruled in deciding Defendants' Motion to Dismiss, "any due process violations must have occurred after that date and must relate directly to Plaintiff's termination." Docket # 25, at 15.
Moreover, Plaintiff chose not to participate in the departmental disciplinary proceedings, and in making this choice, waived his opportunity to be heard. "One who has spurned an invitation to explain himself can't complain that he has been deprived of an opportunity to be heard." Wozniak v. Conry , et al. , 236 F.3d 888, 890 (7th Cir. 2001) (emphasis in original).
Next, the court considers the CAFT Hearing. It is undisputed that the CAFT is an advisory faculty committee which provides findings and recommendations to the President of the University. These hearings were thorough and provided Plaintiff with ample opportunity to present his arguments. Plaintiff does not argue the CAFT hearing process violated his due process rights.
Plaintiff does, however, state repeatedly that the CAFT Report "exonerated" him of eleven of the twelve charges it considered. This is an inaccurate characterization of the CAFT Report's conclusions. "Exonerate" usually means to clear a person *1251 from blame, guilt or wrongdoing.[10] This claim is not consistent with the conclusions of the CAFT Report.
In discussing the charge of misconduct based on Plaintiff's May 12, 2010, email to his students in which Plaintiff stated "I only remember the names of [students] I've had sex with," the CAFT found that the email did not violate the University's sexual harassment policy. "It was, rather, a thoughtless, irresponsible, and stupid effort at a joke, apologized-for the following day. The transmission does give cause for concern about Prof. Wozniak's future conduct , which will be taken up in section IX, infra , but does not give cause to discharge." Id. at 64 (emphasis added).
Summarizing Plaintiff's behavior after he was not given the award, the CAFT stated:
He persistently pursued the perceived wrong with single-minded self-righteousness, oblivious to the feelings of others and in a manner grossly disproportionate to what was at stake. His obsessive and insensitive conduct rendered students, staff, and colleagues alike mistrustful of his motives even to the point of suspecting him of engagement in deceptive and malicious acts.
...
In reaching a recommendation the Committee must also consider Prof. Wozniak's lack of understanding of the negative impact of his actions on students, staff, and colleagues. (The only regret he expressed was for the email regarding sex with [students] ) There is no evidence that Prof. Wozniak would conduct himself any differently should a similar circumstance arise in the future.
Docket # 1-1, at 63-64.
Then, in introducing its recommended sanctions, the CAFT Report states:
Being a self-righteous, obsessed, and insensitive person is not cause to dismiss. Misconduct growing out of those attributes can rise to such a level as to disable a member of the faculty from performing responsibly. The administration has brought twelve charges alleging such misconduct as singly or in combination to justify dismissal. The Hearing Committee has found that Prof. Louis Wozniak has engaged in one act of sanctionable misconduct. While subject to sanction, it is the Committee's unanimous opinion that it does not rise to the level of dismissable conduct. [...] However, it is important to stress that the Hearing Committee unanimously urges Professor Wozniak to move on from the events that led to this hearing, and to focus his energies during the remainder of his academic career on meeting the needs of his students, the duties required of him by his colleagues, students, staff, and administrators, and the standards expected of him by the university and professional bodies of which he is a member.
Docket # 1-1, at 68-69 (emphasis in original).
Far from "exonerating" Plaintiff, the CAFT Report found that while one charge was sanctionable misconduct (specifically, his publishing information about Student A), much of Plaintiff's other behavior was, at least, quite troubling.
Finally, the court considers the adequacy of the Board of Trustees hearing. There is no dispute that the Board of Trustees was the ultimate decision maker regarding Plaintiff's employment. Plaintiff argues that the Board of Trustees should not have considered charges that the *1252 CAFT found did not warrant discipline, but provides no authority to show why the Board of Trustees was in any way bound, under the principles of constitutional due process, by the CAFT Report. Insofar as he challenges the Board of Trustees having considered these charges, the court rejects Plaintiff's argument.
Plaintiff was represented by counsel throughout the period between the CAFT Report and the Board of Trustees hearing, as well as at the hearing itself. He communicated extensively with the University about the hearing process leading up to the September 23, 2013, hearing. The Board of Trustees hearing itself was a four-hour affair. Plaintiff testified and also submitted a written argument about both his pre-CAFT Report misconduct and his post-CAFT Report misconduct. After consideration of matters presented at the hearing, along with the record and written materials, the Board of Trustees issued its written decision to terminate Plaintiff's employment on November 14, 2013.
Plaintiff argues that Attorney Christopher Wilson's role in advising the University "call[s] into question whether Wozniak received a sham hearing before the [Board of Trustees]." As discussed above in the section on notice, the University engaged outside counsel to ensure they handled Plaintiff's termination properly, perhaps a wise decision given the complexity and gravity of the proceeding. The fact that attorney Christopher Wilson provided legal services and advice to the University does not support an inference that attorney Christopher Wilson engineered a sham proceeding that would inevitably result in the University firing Plaintiff.
Plaintiff also argues he was not provided due process because he was given 40 minutes at the Board of Trustees hearing to defend against "more than sixty new charges raised." Those charges all related to Plaintiff's undisputed post-CAFT Report publishing of confidential student information, conduct that Plaintiff was expressly told not to commit. Plaintiff has never denied posting this material, including at the Board of Trustees hearing.
In addressing a similar contention, and ultimately explaining this court's conclusion that Plaintiff's hearing was constitutionally sufficient, the Seventh Circuit's discussion from Wozniak v. Conry bears revisiting:
What is more, even for the most important decisions, an evidentiary hearing is required only if there are material factual disputes. District courts regularly grant summary judgment without receiving oral testimony, and they dismiss complaints without receiving evidence, yet no one supposes that the Federal Rules of Civil Procedure violate the Constitution on that account. The due process clause does not require a hearing-in either a court or a university-where there is no disputed issue of material fact to resolve. See Codd v. Velger , 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) ; Paige v. Cisneros , 91 F.3d 40 (7th Cir. 1996). Here there is no material dispute: Wozniak refused to follow the University's grading rules, and in this suit he trumpets a claim of right to defy them. Why hold a hearing when the insubordination is conceded?
Wozniak , 236 F.3d at 890-91.
The instant facts are analogous to those in Wozniak v. Conry. Here, Plaintiff refused to follow the CAFT Report recommendations, as well as repeated specific written University directives from Defendant Vice Provost Wilson in February 2013, that required him to refrain from publishing student information on the internet. He concedes that he refused to follow these directives, yet argues there was still something lacking in the hearing *1253 he received. The Board of Trustees, in an abundance of caution, still afforded Plaintiff another opportunity to be heard on this conduct.
Further, in addition to an in-person hearing, Plaintiff was also granted ample opportunities to provide the Board of Trustees with written argument, and he did so through his counsel.
A faculty member is hardly in a position to argue that the opportunity to submit an explanation or statement of position in writing is inadequate; professors make their living by the written word, so illiteracy is not a risk that the decisionmaker must consider when devising procedures for dispute resolution.
Wozniak , 236 F.3d at 890-91.
The Board of Trustees hearing process afforded Plaintiff a constitutionally sufficient opportunity to be heard.
Plaintiff also argues he received only "sham process," rather than due process. He cites Levenstein v. Salafsky , 164 F.3d 345, 351 (7th Cir. 1998) for its holding that even where notice is sufficient, where the procedures used to investigate charges are properly alleged to have been nothing more than a sham, there has not been a constitutionally sufficient opportunity to respond.
The procedural posture in Levenstein , however, is different than the current motion before the court. In Levenstein , the Seventh Circuit was considering a district court's denial of a motion to dismiss. Taking all the plaintiff's allegations of sham process as true, the Seventh Circuit agreed that he had stated a due process claim sufficient to defeat the defendants' qualified immunity defense at the pleadings stage. Levenstein , 164 F.3d at 351. (emphasis added). Here, the court is ruling on a summary judgment motion, and Plaintiff must put forth facts rather than mere allegations.
Even presuming, arguendo , that Levenstein was decided at summary judgment, and further presuming the plaintiff's allegations of "sham process" were instead undisputed material facts, Levenstein would not be applicable. First, the plaintiff's arguments there all related to the investigation of his behavior. Here, the material facts of Plaintiff's behavior are not in dispute. Additionally, the plaintiff in Levenstein never took advantage of the hearings that were offered, instead quitting his job, and thus waiving his chance to present his argument about a sham investigation at a hearing. Levenstein v. Salafsky , 414 F.3d 767, 773 (7th Cir. 2005). Here, Plaintiff had two lengthy hearings and ample opportunity to submit written arguments. Furthermore, the Board of Trustees terminated Plaintiff's tenure and employment in a 17-page report that carefully reviewed Plaintiff's case. In its report, the Board of Trustees considered the gravity of Plaintiff's behavior in disregard of student confidentiality, the clear instructions he was given, and his near blanket lack of remorse for his behavior, and weighed this against Plaintiff's almost 50 years as a University professor. See Docket # 1-2, at 50-51. Plaintiff points to no evidence that the hearings he was afforded were merely a sham.
Plaintiff also cites Ciechon , 686 F.2d at 517 in support of his argument of a sham proceeding. In Ciechon , Ciechon and a partner were paramedics for the Chicago Fire Department. Ciechon had an exemplary employment record. Some twenty-seven hours into a thirty-eight hour emergency shift, during a snowstorm, Ciechon and her partner responded to a call where a man named Ciebien complained of shortness of breath. After carefully assessing the situation, and Ciebien declining their *1254 repeated offers to transport him to the hospital, Ciechon and her partner left. Ciebien soon died. Ciebien's family contacted the Mayor's office and the local CBS television affiliate, providing a summary of events starkly different than what actually occurred.
In the face of significant media attention, Ciechon was charged with seven counts of professional misconduct, and, after a hearing, and despite the evidence at the hearing, was fired. No other members of the ambulance crew were disciplined.
The Seventh Circuit found Ciechon had been denied due process, but ruled narrowly on the facts of the case:
In this case the family's grief was expressed in pointless vengeance and, in view of media and family pressure, the official investigation was single-mindedly and intentionally directed to ruining the career of one, but only one, of the four employees involved in this unfortunate incident. Because of these two factors, we have no difficulty in finding violations of procedural due process and equal protection. However, we have no intention of opening the floodgates to review all municipal personnel decisions. It is only because these defendants purposely and invidiously chose one of two similarly situated employees for undeserved punishment and misused otherwise legitimate disciplinary procedures that our intervention is justified.
Ciechon , 686 F.2d at 516-17.
The facts of the case at bar are markedly different, and the Seventh Circuit's narrow holding in Ciechon does not assist the court's analysis. There is no indication Plaintiff was singled out from similarly situated professors for discipline, nor that the University misused otherwise legitimate disciplinary procedures.
The court finds that there are no material issues of disputed fact related to the notice or the hearings Plaintiff was afforded. The notice and hearings were consistent with the requirements of constitutional due process. Attorney Christopher Wilson's legal services to the University did not violate Plaintiff's due process rights. Summary judgment is granted on behalf of Defendants as to Count II.
3. Qualified Immunity
Defendants also argue they are also entitled to qualified immunity on Plaintiff's due process claim. As an initial matter, and as set forth above, because the court has already found that Plaintiff failed to set forth a constitutional claim, Defendants, in their individual capacities, are entitled to qualified immunity on Count II. See Pearson , 555 U.S. at 236-37, 129 S.Ct. 808.
Further, even if Plaintiff had set forth a constitutional claim, ruling in the alternative the court finds Defendants are entitled to qualified immunity on Plaintiff's due process claim.
The Seventh Circuit recently explained:
Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about. Mustafa v. City of Chicago , 442 F.3d 544, 548 (7th Cir. 2006) (emphasis in original) (citation omitted). It protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs , 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Once qualified immunity is raised, the plaintiff has the burden of establishing that his or her rights were violated and that the law concerning the proffered right "was clearly established at the time the challenged *1255 conduct occurred." Mustafa , 442 F.3d at 548. Then, the court must determine whether a reasonably competent official would know that the conduct was unlawful in the situation he confronted.
Burritt , 807 F.3d at 249.
It cannot be said as a matter of law that it was clearly established at the relevant times that the notice and hearing afforded to Plaintiff violated due process. Plaintiff was provided with notice of the charges and given a full hearing before the CAFT at his request. He was then provided notice that his additional misconduct would be part of the Board of Trustees hearing. Finally, he was provided a hearing before the ultimate decision maker, the Board of Trustees, where he responded to all alleged misconduct and took the position that, aside from the email about having sex with students, he would do nothing different if presented with the same situation again. The process under Article X, as well as the extensive procedure-related discussions between Plaintiff's counsel and the University, apprised Plaintiff of the proceeding, and afforded him an opportunity to present his objections. See Head , 225 F.3d at 804. Given the standards set forth above in Pugel and Loudermill , it cannot be said that the defendants should have known that their conduct violated the law, or could have known that providing notice, along with two hearings prior to termination, and ample opportunity to submit written arguments, would be clearly unconstitutional under the facts and circumstances of this case.
The undisputed material facts before the court show Defendants are entitled to qualified immunity on Plaintiff's due process claims. Summary judgment is granted in favor of Defendants and against Plaintiff on the alternative basis of qualified immunity.
E. Lack of Personal Involvement
Defendants' final argument is that the individual Defendants are entitled to summary judgment in their favor due to a lack of personal involvement as to Counts I and II.
Individual liability under § 1983 must be based upon personal responsibility. See Chavez v. Ill. State Police , 251 F.3d 612, 651 (7th Cir. 2001). " Section 1983 creates a cause of action based upon personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." Vance v. Peters , 97 F.3d 987, 991 (7th Cir. 1996) (quoting Sheik-Abdi v. McClellan , 37 F.3d 1240, 1248 (7th Cir. 1994) ). Plaintiff must demonstrate "a causal connection between (1) the sued officials and (2) the alleged misconduct." Colbert v. City of Chicago , 851 F.3d 649, 657 (7th Cir. 2017). A supervisor may be liable for the actions of a subordinate if the supervisor knows about the conduct and facilitates, approves, condones, or turns a blind eye toward it. See Gentry v. Duckworth , 65 F.3d 555, 561 (7th Cir. 1995).
Defendants Adesida, Hogan, Easter, Clower, Wilson, Wise, Finkin, and Johnson were all directly involved, though to varying degrees, in the investigation, preparation, and presentation of charges that resulted in the Board of Trustees deciding to terminate Plaintiff's employment. The court has ruled that they did not deprive Plaintiff of his constitutional rights, and alternatively that they were entitled to qualified immunity on all of Plaintiff's claims. However, the court disagrees with Defendants' argument that Adesida, Hogan, Easter, Clower, Wilson, Wise, Finkin, and Johnson had so little to do with Plaintiff's termination that they could be found not liable on the theory of lack of personal involvement. Defendants' lack-of-personal-involvement *1256 argument does not provide an additional basis to grant Defendants' motion as to Adesida, Hogan, Easter, Clower, Wilson, Wise, Finkin, and Johnson.
Defendant Chris Kennedy must be analyzed separately from the other individual Defendants. Kennedy's sole role was to act as the Chairman of the Board of Trustees, at the time Plaintiff's case was before the Board of Trustees. Neither Kennedy, nor the rest of the Board of Trustees, participated in the Wozniak matter until President Easter referred the matter to the Board on February 8, 2013. The board, as a body, retained attorney Christopher Wilson to provide legal services related to Plaintiff's termination. While the Board of Trustees had the authority to revoke Plaintiff's tenure and terminate his employment, and ultimately did so, Kennedy did not. He was only one member of the Board of Trustees. Further, in responding to Defendants' lack-of-personal-involvement argument, Plaintiff provides the court with no basis for finding Kennedy personally liable. The court finds there is no causal connection between Defendant Kennedy and Plaintiff's claims. Summary judgment is thus granted as to Kennedy on this additional basis as well.
III. CONCLUSION
This court has fully reviewed the record, including but not limited to the complaint and exhibits, motions, responses, replies, memoranda, deposition transcripts and exhibits, affidavits, and this court's prior orders herein. Following this careful review, the court concludes that, despite taking all the facts in Plaintiff's favor, there is no genuine issue of material fact, and Defendants are entitled to summary judgment as a matter of law.
Regarding Plaintiff's First Amendment retaliation claim, the court first finds that based on the content, form, and context Plaintiff's speech was not on a matter of public concern, and therefore his speech was not protected by the First Amendment. Furthermore, Plaintiff's speech was not protected because the interest of the University in promoting the efficiency of the public education services it performs outweighs Plaintiff's interests in speaking as he did.
Alternatively, the court finds that Defendants would have still terminated Plaintiff's employment regardless of any protected speech even if his speech about the award was protected.
Regarding Plaintiff's First Amendment prior restraint claim, the court first finds that because the CAFT was not a decision maker with regard to Plaintiff's employment, the language in the CAFT Report recommendations was not a prior restraint on Plaintiff's speech. The court further finds the speech that the CAFT Report recommended Plaintiff refrain from engaging in was not on a matter of public concern, and therefore was not protected.
Additionally, the court finds Plaintiff's speech about his interrogation of Student A and her emotional response was not protected because his interest in publishing that information was outweighed by the University's interest in protecting the educational services it provides to students. The court finds the speech the CAFT recommended Plaintiff refrain from engaging in was damaging to student trust and destructive to the learning environment.
Alternatively, even if Plaintiff had established any violation of his First Amendment rights, the court further finds that Defendants are entitled to qualified immunity on Plaintiff's First Amendment claims. The proffered rights were not clearly established as they apply to the facts underlying Plaintiff's First Amendment claims.
*1257 Regarding Plaintiff's due process claim, the court finds Plaintiff received constitutionally adequate notice and a constitutionally adequate opportunity to be heard. The court rejects Plaintiff's argument that he received only "sham process."
Even if Plaintiff had established a due process violation, the court finds Defendants are entitled to qualified immunity on Plaintiff's due process claim as well. The proffered rights were not clearly established under the facts of this case.
Finally, the court finds that Defendant Kennedy did not have direct personal involvement beyond his role as a member of the Board of Trustees and that he is entitled to summary judgment on that basis as well.
The court finds Defendants Adesida, Hogan, Easter, Clower, Wilson, Wise, Finkin, and Johnson had direct personal involvement in Plaintiff's termination, and that they are not entitled to summary judgment purely on a theory of lack of personal involvement. However, they are entitled to summary judgment for all of the other reasons set forth above.
IT IS THEREFORE ORDERED:
1) Defendants' Motion to Strike (# 70) is DENIED.
2) Defendants' Motion for Summary Judgment (# 64) is GRANTED in full.
3) Defendants' Motion in Limine (# 77) is DENIED as MOOT.
4) All hearing dates currently set herein are cancelled.
5) This cause is TERMINATED.

Plaintiff admits the content and materiality of Defendants' 103 paragraphs of undisputed facts both by failing to respond to them in his Response (# 69), and expressly in his Response to Motion to Strike (# 75), ¶¶ 5-6.

The court construes Plaintiff's "Statement of Undisputed Material Facts" in his Response as the Additional Facts section contemplated by Local Rule 7.1(D)(2)(b)(5), but disregards facts inconsistent with the already-admitted Defendants' Undisputed Material Facts. The court also disregards "facts" articulated by the Plaintiff without an accurate citation to the record, for example, Plaintiff's Additional Facts 22, 27, 28 (blanket citation to the Complaint), 41 (citation does not support the assertion), 46, 58, 59, 84, 95, 145, 154, 157, 169 (no citation). See Coffey v. Cox , 218 F.Supp.2d 997, 999 n.3 (C.D. Ill. 2002) (it is the party's responsibility to point the court to exactly where in the record a genuine issue of material fact exists which would preclude the court from entering summary judgment); Gross v. Town of Cicero, Ill. , 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record").

Plaintiff's request to be heard before the Committee on Academic Freedom and Tenure ("CAFT") was submitted sometime after his receipt of, and in response to, the August 11, 2011, charges. Though the CAFT was reviewing other now-time-barred disciplinary actions taken by the University against Plaintiff prior to that date, there is no indication that any hearing or process of the CAFT prior to August 11, 2011, had any bearing on the Board of Trustees' decision to terminate Plaintiff.

The exact date in June 2013 when Plaintiff first received notice is not clear from the record. Plaintiff's counsel acknowledged having received notice of the allegations related to Plaintiff's post-CAFT Report conduct in a June 26, 2013, letter to the University, however, so he had notice at least as of that date.

Because the two-step Connick - Pickering analysis is incorporated in the three-step Mt. Healthy analysis, this framework has also been formulated as a four element test. See, e.g., McGreal v. Ostrov , 368 F.3d 657, 672 (7th Cir. 2004). The legal analysis is identical under either characterization.

Plaintiff remains focused on vindicating his right to have received the award, even now. His Response refers to his speech as having been about "Defendant's improperly denying him a teaching award that he had legitimately won." Docket # 69, at 42.

Another example: "[Plaintiff's counsel] would have the Hearing Committee take the position either that Professor Wozniak was wrongfully denied the award or that he could reasonably believe that that was so. The Committee finds no grounds in the record for it to rule on the disputed award." CAFT Report, Docket # 1-1, at 64.

In responding to Defendants' argument here Plaintiff references only a letter to Plaintiff from Adesida dated March 30, 2010, the Statement of Charges' reference to Plaintiff's May 12, 2010, email to students that included a YouTube link to a video of Plaintiff talking about not receiving the award, and the index of exemplars presented to the Board of Trustees, specifically that that document was "replete with examples of Wozniak communicating about the teaching award scheme. " (emphasis added). Plaintiff makes no assertion that publication of confidential student information was protected speech.

The court rejects Plaintiff's characterization of either 89 days' or 66 days' notice as "shortly before the Plaintiff's hearing before the Board of Trustees." Docket # 69, at 61.

Exonerate means "To free from responsibility. To clear of all blame; to officially declare (a person) to be free of guilt; exculpate." BLACK'S LAW DICTIONARY (10th ed. 2014).